**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STEPHEN GILL,

   Plaintiff,

      v.                                     Civil Action No. 18-2380 (JEB)

UNITED STATES OF AMERICA, *et al*.,

   Defendants.

## MEMORANDUM OPINION

The Supreme Court has often emphasized that "[j]ust as military society has been a society apart from civilian society, so 'military law . . . is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment.'" Parker v. Levy, 417 U.S. 733, 744 (1974) (alterations omitted) (quoting Burns v. Wilson, 346 U.S. 137, 140 (1953)).  Sometimes, however, military law and society collide with their civilian counterparts. This is one such case.  The Court here considers the suit brought by Stephen Gill, a current civilian and former active-duty officer who was forcefully taken from his Massachusetts home by U.S. Marshals and compelled to testify in Virginia by video in front of a Guantanamo Bay military commission.

Gill alleges a variety of claims against the Government and its employees, seeking recompense for his treatment at their hands.  Many of his theories of relief implicate the fragile divide between the military and civilian court systems, a divide this Court is hesitant to breach unnecessarily.  While troubled by the conduct alleged in the Complaint, it ultimately concludes that the Individual Defendants are immune from suit — immunity that precludes the Court from

reaching the merits of the claims against them.  As such, it will partially grant Defendants'

Motions to Dismiss.  The Court offers no opinion as to the remainder of Gill's counts, which he

lodges against the United States under the Federal Tort Claims Act.  Instead, he must pursue

such claims in the venue in which most of the offensive conduct took place — *i.e.*, the District of

Massachusetts.  The Court accordingly transfers what is left of the case there for further

proceedings.

## I.    Background

### A.  Factual Background

The Military Commissions Act of 2006 "authorize[s] trial by military commission for

violations of the law of war, and for other purposes."  Pub. L. No. 109–336, 120 Stat. 2600

(codified at 10 U.S.C. §§ 948–49).  Today's military commissions are the product of an

extensive dialogue among all three branches of government.  Signed into law by two different

Presidents, the MCA was originally passed by Congress following a Supreme Court decision that

invalidated the prior commission process, see Hamdan v. Rumsfeld, 548 U.S. 557, 635 (2006),

and it was amended 2009.  See Pub. L. No. 111-84, § 1807, Stat. 2574.  The MCA establishes a

"special set of procedures for using 'military commissions to try alien unprivileged enemy

belligerents.'"  *In re* Al-Nashiri, 921 F.3d 224, 227 (D.C. Cir. 2019) (quoting 10 U.S.C. §

948b(a)).  These procedures are borrowed from the courts-martial system, which is similar to but

distinct from its civilian cousin.  See O'Callahan v. Parker, 395 U.S. 258, 261 (1969) ("[T]he

exigencies of military discipline require the existence of a special system of military courts in

which not all of the specific procedural protections deemed essential in Art. III trials need

apply.")

2

This case arises out of the prosecution of Abd Al-Rahim Hussein Muhammed Al-Nashiri in the military commission at Guantanamo Bay.  Al-Nashiri stands accused of orchestrating a series of bombings in the 2000s on behalf of Al-Qaeda, attacks that resulted in at least eighteen fatalities and almost fifty injuries.  See *In re* Al-Nashiri, 921 F.3d at 226.  This case does not concern the Government's treatment of Al-Nashiri, but rather the conduct of a military judge, two prosecutors, and approximately 23 U.S. Marshals *vis-à-vis* Gill.  In recounting the background, the Court, as it must, treats the facts in the Amended Complaint as true.

Gill is a resident of Massachusetts who formerly served as an officer and judge advocate in the U.S. Navy reserves.  See ECF No. 7 (First Amended Complaint), ¶¶ 4, 13.  While on active duty, he acted as legal advisor *pro tempore* for the Al-Nashiri military commission.  Id., ¶ 15.  In that capacity, Plaintiff reported that certain federal employees were violating a Disqualification Order entered by military-commission judge (and Defendant in this suit) Colonel Vincent Spath barring them from working on Al-Nashiri's case.  Id., ¶¶ 14–16.  Following these events, Gill was reassigned to another military command and then demobilized from active duty.  Id., ¶¶ 17, 20.  He returned to civilian status in May of 2015.  Id., ¶ 20.

Plaintiff would not enjoy the relative tranquility of civilian life for long.  That same month, defense counsel for Al-Nashiri filed a motion requesting Gill's presence at an evidentiary hearing, which the Court presumes related to his former involvement with the case.  Id., ¶ 21.  Gill requested that he be permitted to testify via video teleconference (VTC) from Rhode Island, nearer his home, but he was rebuffed, and he ultimately testified in September 2016 via VTC from Alexandria, Virginia.  Id., ¶¶ 26–28.  After the conclusion of his testimony, Spath informed him that his participation would again be needed at some point between October 17 and October

21. Id., ¶ 27.  Plaintiff requested that he be permitted to deliver any needed additional testimony from somewhere closer to Massachusetts than Virginia.  Id., ¶ 28.

At this point, the situation became unexpectedly adversarial.  First, on October 13, 2016, Gill received a military-commission subpoena signed by Defendant and U.S. Brigadier General Mark Martins — the Chief Prosecutor at Guantanamo Bay — requiring him to appear on October 17 via VTC from Alexandria.  Id., ¶ 33.  Plaintiff applied for relief from the subpoena as permitted by the relevant military-commission rules, which are promulgated by the Department of Defense.  Id., ¶ 34; see also R.M.C. 703(e)(2)(F) (in case of subpoena directed to a civilian, "[i]f a person subpoenaed requests relief on the grounds that compliance is unreasonable or oppressive, the convening authority or, after referral, the military judge may direct that the subpoena be modified or withdrawn if appropriate").  Gill did not receive a response to this request, and he did not appear in Alexandria on October 17.  Martins and Defendant Mark Miller (another prosecutor on the case) therefore demanded from Spath a "warrant of attachment" compelling Gill's VTC testimony.  Id., ¶ 35.  Instead of seeking to resolve this telephonically or in another fashion, Spath complied with that request, issuing a warrant that empowered and commanded various U.S. Marshals to procure Gill's presence in Virginia so that he could deliver the sought-after testimony.  Id., ¶ 39.

Although non-appearing witnesses in civilian courts frequently change their minds when informed of a signed arrest warrant, such opportunity was not afforded Gill.  Instead, armed with the warrant as well as a variety of weapons, the Marshals "stormed . . . Gill's home with . . . hand guns drawn," forced him to give himself over to their custody, and then searched "every room" of his home.  Id., ¶¶ 40–46.  The Marshals "forcibly" placed Gill "in waist shackles and ankle shackles" and transported him to a holding cell in the basement of the U.S. District

Courthouse in Boston.  Id., ¶¶ 47, 51, 53–54.  After a few hours of detention there, Plaintiff was escorted to Logan Airport, whence he traveled (still in handcuffs) to Arlington.  Id., ¶ 54.  Gill spent the night at a detention center in Alexandria, where the Marshals gave him only a "deconstructed . . . bologna sandwich" for sustenance.  Id., ¶ 57.  Finally, on October 19, a different set of Marshals transported him to a conference room, where he testified via VTC.  Id., ¶¶ 58–59, 62.

Perhaps unsurprisingly given this rocky prelude, Gill's testimony did not proceed smoothly.  He complained to Spath about his seizure and detention, and he noted that given the "extreme duress" he was under, his testimony was "inherently unreliable."  Id., ¶ 62.  Spath refused to consider any arguments regarding the lawfulness of Gill's seizure and detention, but he did administer a competency exam, which Plaintiff passed.  Id., ¶¶ 63–64.  During Gill's testimony, Spath "explicitly instructed Mr. Al-Nashiri's defense counsel not to inform Mr. Gill [of his right to counsel]."  Id., ¶¶ 66–68.  After concluding his testimony, Gill requested that the Government pay for his transportation back to Massachusetts as well as for meals in the interim period.  Id., ¶ 73. After some wrangling, the Marshals booked him a flight home and gave him $300 in cash.  Id., ¶ 75.  Gill asserts that since this traumatic series of events, he has suffered from severe emotional distress, economic harms, and the deterioration of his reputation in the eyes of the military.  Id., ¶¶ 77, 80, 83.

One subsequent development is worth mentioning.  In April of this year, the D.C. Circuit considered an allegation of judicial misconduct lodged against Spath.  See In re Al-Nashiri, 921 F.3d at 224.  From November 2015 to April 2019, Spath applied for a position as an immigration judge with the Department of Justice while simultaneously presiding over Al-Nashiri's commission, a proceeding in which DOJ had a vested interest.  Id. at 227.  After finding that

"Spath's job application . . . cast an intolerable cloud of partiality over his subsequent judicial conduct," the Court vacated every single order (oral and written) issued by Spath from November 2015 to April 2019 in Al-Nashiri's case.  Id. at 235, 240.

B.  Procedural History

Seeking remuneration for the above-chronicled series of events, Gill first filed a claim with the Department of Justice under the Federal Tort Claims Act.  See First Am. Compl, ¶ 86; see also 42 U.S.C. § 2675(a) ("An action shall not be instituted upon a claim against the United States for money damages . . . unless the claimant shall have first presented the claim to the appropriate Federal agency.").  The Government did not render a final disposition of his FTCA claim within six months, inaction that qualifies as a "final denial of the claim," permitting Gill to file a lawsuit in federal court.  Id.

On October 26, 2018, Plaintiff brought the present action in this Court.  He filed an Amended Complaint in February of this year.  Gill's Amended Complaint asserts a Fourth Amendment claim under Bivens against the numerous individuals involved in his seizure and transport — Judge Spath, prosecutors Martins and Miller, and the U.S. Marshals.  See First Am. Compl., ¶¶ 90–93.  He also articulates seven counts against the United States under the FTCA, among them abuse of process, trespass, and intentional infliction of emotional distress.  Id., ¶¶ 94–115.  Finally, he asserts Declaratory Judgment Act claims against the Government and the Individual Defendants.  Id., ¶¶ 116–150.  In their separate Motions, the United States and the Individual Defendants move to dismiss Gill's entire suit under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), or, in the alternative, to transfer outstanding counts to Massachusetts.

II.    **Legal Standard**

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a

complaint fails to "state a claim upon which relief can be granted."  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation omitted).  Additionally, Rule of Civil Procedure12(b)(1) provides for dismissal of an action for lack of subject-matter jurisdiction.  To survive such a motion, the plaintiff bears the burden of proving that the Court has subject-matter jurisdiction to hear his claims.  See Lujan v. Defs of Wildlife, 504 U.S. 555, 561 (1992); US Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."  Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).

In evaluating Defendants' Motion to Dismiss, the Court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation omitted) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979) (citing Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993)).  This standard governs the Court's considerations of Defendants' Motions under both Rule 12(b)(1) and Rule 12(b)(6).  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."); Walker v. Jones, 733 F.2d 923, 925–26 (D.C. Cir. 1984) (same).  The Court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint.  Trudeau v.

FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

**III.    Analysis**

The Individual Defendants and the United States raise a slew of arguments in support of their respective Motions to Dismiss.  First, both assert that this Court does not have jurisdiction to hear any of Gill's claims.  Next, the Individual Defendants argue that they are protected by the doctrines of judicial, prosecutorial, and qualified immunity.  Even without immunity, they maintain that Gill's claim brought under Bivens represents an impermissible extension of that doctrine.  The United States, for its part, posits that Gill has failed to state an FTCA claim for numerous reasons, including that the counts fall within the Act's discretionary exception and that proper venue does not lie in this district.  The Court first turns to Defendants' jurisdictional argument, then considers the different types of immunity asserted, and finally looks at venue under the FTCA.

A.    Jurisdiction

As a threshold matter, the Government and the Individual Defendants argue that the MCA divests the Court of jurisdiction over all of Gill's claims.  Section 7 of the MCA explains in relevant part:

> Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. 801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. § 2241(e)(2).  According to Defendants, because the Act deprives the Court of jurisdiction over "any . . . action. . . relating to . . . the detention[,] . . . treatment," or "trial" of an "alien . . . detained as an enemy combatant" — such as Al-Nashiri — and Gill's claims "relate"

to Al-Nashiri's detention, treatment, and trial, the Court cannot consider them. Plaintiff counters that the Act is best read as stripping civilian courts of jurisdiction over claims brought only by detainees themselves, and he points to precedent in this Circuit and others in support of that position.

The Court agrees with Gill that § 2241(e) does not sweep quite so broadly as to preclude all suits brought by citizen non-detainees that might relate in any way to an ongoing proceeding at a military commission. As a purely textual matter, it is arguable that Gill's claims relate not to Al-Nashiri's "detention, transfer, [or] treatment" but instead to his own. In any event, a great deal of circuit precedent stands in the way of Defendants' position. Courts appear to have uniformly assumed that § 2241(e) applies only to claims brought by alien-detainees. As the Ninth Circuit has noted, "[T]here is no dispute that § 2241(e)(2) makes a distinction between aliens and citizens." Hamad v. Gates, 732 F.3d 990, 1005 (9th Cir. 2013). This determination has played a crucial role in challenges to and decisions affirming the provision's constitutionality. Although not squarely presented with the question at issue here, the D.C. Circuit has held that "§ 2241(e)(2) constitutionally . . . encompasses . . . claims, whether statutory or constitutional, brought by an alien detained by the United States and determined to have been properly detained as an enemy combatant." Janko v. Gates, 741 F.3d 136, 146 (D.C. Cir. 2014) (emphasis added); see also Jawad v. Gates, 832 F.3d 364, 370 (D.C. Cir. 2016) ("Nothing odd results from applying section 7(a)'s jurisdictional bar to suits by detainees who have been determined to be enemy combatants."); Hamad, 732 F.3d at 1006 ("Congress's decision in § 2241(e)(2) to preclude only alien detainees captured as part of the war on terror from bringing damages actions easily passes rational basis review.") (emphases added); Ameur v. Gates, 759 F.3d 317, 327–28 (4th Cir. 2014) (holding that § 2241(e)(2) passes rational-basis

review even though it "<u>applies only to aliens</u>" because "aliens detained as enemy combatants enjoy no fundamental right to money damages remedy") (emphasis added).

These Courts' interpretations align with Congress's purported intent in enacting the MCA — namely, to "ensur[e] that members of the armed forces are not unduly chilled in conducting the war on terror by concerns about foreign nationals targeting them with damages claims." Hamad, 732 F.3d at 1006.  Congress, it seems "rationally conclude[d] that litigation involving non-citizen combatants poses a special risk of raising foreign relations, immigration or military-related matters that courts are not equipped to address . . . consistent with the long-standing differential treatment of enemy aliens during times of war."  Ameur, 759 F.3d at 328 (emphasis added).  The Court sees no reason to endorse the novel interpretation of the Act provided by the Government.

    B.  Claims Against Individual Defendants

With that underbrush cleared, the Court would typically move to Gill's constitutional and statutory claims against the Individual Defendants.  By way of reminder, he challenges the issuance of a subpoena mandating his testimony via VTC, along with his seizure, transportation, and detention — i.e., the means by which the Government chose to enforce his compliance with the subpoena.  At the core of Gill's suit lie his assertions that Miller and Martins lacked legal authority to issue the subpoena and that Spath acted unlawfully in signing the warrant of attachment to enforce it.  For the reasons that follow, however, even assuming that Gill's legal arguments are correct, the Individual Defendants have another card to play: immunity. Defendants argue that Spath, Martins, and Miller are entitled to absolute immunity, and that they and the U.S. Marshals also deserve qualified immunity.  The Court tackles the doctrines in turn.

1. *Absolute Immunity*

The Supreme Court has determined that "some officials perform 'special functions which deserve absolute protection from damages liability.'" Grey v. Poole, 243 F.3d 572, 575 (D.C. Cir. 2001) (alterations omitted) (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 268–69 (1993)). Derived from the common law, absolute immunity provides a potent shield against civil suits. "Where absolute immunity is deemed appropriate, an official is protected from all suits attacking conduct within the scope of the immunity, even if the official is alleged to have acted in bad faith." Id. The official seeking such immunity bears the burden of showing that it is justified for the function in question. See Burns v. Reed, 500 U.S. 478, 486 (1991). The Court looks first at the judge, then the prosecutors.

   a.   Spath

Judges are among those select officials entitled to absolute immunity so that they may "be free to act upon [their] own convictions, without apprehension of personal consequences to [themselves]." Mireles v. Waco, 502 U.S. 9, 10 (1991) (quotation marks omitted). Concern with protection of the judicial process broadly has led to the doctrine's application in a variety of contexts. The Supreme Court has extended judicial immunity not only to federal and state judges but also to officials associated with other branches of government (such as administrative-law judges), so long as they exercise "quasi-judicial" authority. See Butz v. Economou, 438 U.S. 478, 512 (1978).

This Circuit has distilled from the Supreme Court's caselaw a three-part inquiry as to whether a government official exercises quasi-judicial authority: "(1) whether the functions of the official in question are comparable to those of a judge; (2) whether the nature of the controversy is intense enough that future harassment or intimidation by litigants is a realistic

prospect; and (3) whether the system contains safeguards which are adequate to justify dispensing with private damage suits to control unconstitutional conduct." Wagshal v. Foster, 28 F.3d 1249, 1252 (D.C. Cir. 1994).

Applying that test, this Court is convinced that a judge presiding over a military commission, such as Spath, exercises "quasi-judicial" authority. First, there can be "little doubt" that the role of a modern military judge is "functionally comparable" to that of a trial judge. Butz, 438 U.S. at 513. Military judges preside over trials with marked similarities to their civilian counterparts and "exercise a discretionary judgment as a part of their function." Broudy v. Mather, 366 F. Supp. 2d 3, 10 (D.D.C. 2005) (quoting Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 436 (1993)). Second, few could gainsay the intensity of the litigation concerning Guantanamo Bay, which has resulted in seminal Supreme Court decisions and no shortage of public comment. Finally, the military-commission system contains several safeguards to justify dispensing with private-damage suits, safeguards similar to those found within other adjudicatory systems, such as appellate review and the availability of habeas relief. Even without those safeguards, moreover, where the first two factors support the extension of absolute immunity, a court can deem it warranted. See Broudy, 366 F. Supp. 2d at 11.

In addition to holding that Spath, in presiding over the Al-Nashiri Military Commission, exercised "quasi-judicial" authority, the Court also finds that he is entitled to absolute immunity for the act at issue — *viz.*, the issuance of the warrant of attachment. In arguing to the contrary, Gill faces an uphill battle. Perhaps unsurprisingly given the identity of those responsible for developing the doctrine, judicial immunity is broad in scope. "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority." Smith v. Scalia, 44 F. Supp. 3d 28, 41 (D.D.C. 2014) (quoting Stump v. Sparkman,

435 U.S. 349, 356 (1978)).  There are only two exceptions to judicial immunity: "(1) 'a judge is not immune from liability for nonjudicial actions'; and (2) 'a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction.'"  Reddy v. O'Connor, 520 F. Supp. 2d 124, 130 (D.D.C. 2007) (quoting Mireles, 502 U.S. at 11–12).

Gill principally argues that the latter circumstance is present here.  In other words, he maintains that Spath acted in the "clear absence of all jurisdiction" in issuing the warrant of attachment.  This is so, he claims, both because Spath's orders in the Al-Nashiri case were later vacated by the D.C. Circuit (as recounted above) and because military judges do not have "jurisdiction" to issue such warrants.

Gill's argument, however, misconstrues the term jurisdiction as it has been applied in the context of absolute judicial immunity.  His confusion is understandable: "Jurisdiction, it has been observed, is a word of many, too many, meanings."  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 90 (1998) (internal quotation marks omitted); see also City of Yonkers v. United States, 320 U.S. 685, 695 (1944) (Frankfurter, J., dissenting) ("'Jurisdiction' competes with 'right' as one of the most deceptive of legal pitfalls.").  In the context of judicial immunity, however, the "scope of the judge's jurisdiction must be construed broadly."  Clark v. Taylor, 627 F.2d 284, 287 (D.C. Cir. 1980).  The focus remains on jurisdiction over the subject matter as opposed to over the specific person involved.  See Chisum v. Colvin, 276 F. Supp. 2d 1, 4 (D.D.C. 2003) ("[A] judge is entitled to immunity even if there was no personal jurisdiction over the complaining party.") (quoting Ashelman v. Pope, 793 F.2d 1072, 1076 (9th Cir. 1986)).  An absence of jurisdiction exists where "the judicial officer must know that he lacks jurisdiction, or act[s] despite a clearly valid statute or case law expressly depriving him of jurisdiction." Wagshal, 28 F.3d at 1254 (alterations omitted).

Given this standard, the D.C. Circuit's *ex post* decision to vacate Spath's orders given his alleged conflict of interest has no weight in a determination of his contemporaneous "jurisdiction" over the acts at issue here.  See, e.g., id. at 1253–54 (remarks rendered by case evaluator in letter to judge concerning decision to recuse protected by judicial immunity); Rosenthal v. Justices of the Sup. Ct., 910 F.2d 561, 565–66 (9th Cir. 1990) (absolute immunity for judge who signed order after recusal from case).  Turning to the warrant of attachment, binding case-law dictates that it was not issued in the "absence of jurisdiction" for judicial-immunity purposes.  For example, in Mireles, the Supreme Court held that a judge's alleged "direction to police officers to carry out a judicial order [to procure the presence of counsel] with excessive force" (which action would have been unlawful) was protected by absolute immunity.  See 502 U.S. at 12.   As in Mireles, it is possible (though not certain given the complex landscape of military law) that Spath acted "in excess of his authority," id., even "maliciously." Id. at 11; see also R.M.C. 703(e)(2)(G)(i) ("[M]ilitary judge . . . may . . . issue a warrant of attachment to compel the attendance of a witness.").  "But such an action — taken in the very aid of the judge's jurisdiction over a matter before him — cannot be said to have been taken in the absence of jurisdiction."  Mireles, 502 U.S. at 12.  In other words, even if Spath exceeded his grant of judicial authority, he did not act in the clear absence of jurisdiction.  See Wagshal, 28 F.3d at 1254.  He is thus protected absolutely from Gill's suit for damages.

b.   Martins and Miller

The same impulse animating the doctrine of judicial immunity — *viz.*, protection of the judicial process — is reflected in the extension of absolute immunity to "certain others . . . closely associated with" that process, including prosecutors.  See Cleavinger v. Saxner, 474 U.S. 193, 200 (1985); see also Imbler v. Pachtman, 424 U.S. 409, 430–31 (1976) (recognizing

prosecutorial immunity in a damages suit).  This immunity protects "prosecutors against having 'to answer in court each time a defendant charges him with wrongdoing which diverts his energy and attention from the pressing duty of enforcing the criminal law.'"  Moore v. Valder, 65 F.3d 189, 193 (D.C. Cir. 1995) (alterations omitted) (quoting Imbler, 424 U.S. at 425).

In determining whether prosecutorial immunity obtains, the Supreme Court has employed a "functional approach," considering whether the conduct under review is advocatory, as opposed to investigatory or administrative, in nature.  Id. (citing Burns, 500 U.S. at 486).  In other words, as long as the official in question is acting as an advocate, she need not be a criminal prosecutor (such as an Assistant United States Attorney) in order to enjoy absolute immunity.  See Gray, 243 F.3d at 577–78 (absolute immunity extends to government attorneys for their conduct in prosecuting civil child-neglect actions).  Advocacy "encompasses only those activities that are 'intimately associated with the judicial phase of the criminal process.'" McSurely v. McClellan, 697 F.2d 309, 319 (D.C. Cir. 1982) (quoting Imbler, 424 U.S. at 430). Protected acts therefore include participation (even elicitation of false statements) in a probable-cause hearing, the presentation of evidence (even false evidence) during a trial, and the preparation of witnesses.  See Burns, 500 U.S. at 490–92; Buckley, 509 U.S. at 259, 273.  By contrast, speaking with the press and giving legal advice to a police officer are the sorts of acts not deemed advocatory.  See Van de Kamp v. Goldstein, 555 U.S. 335, 343 (2009).

Applying the above standard, the Court has little trouble concluding that the challenged conduct of Miller and Martins fell within their roles as advocates.  Gill alleges that the pair violated his Fourth Amendment rights by seeking to procure his testimony.  Specifically, Martins signed the subpoena requiring him to appear by VTC, and both Martins and Miller requested a warrant of attachment to enforce that subpoena.  See First Am. Compl., ¶¶ 33–37.  "There is no

dispute[,]" then, that both men "sought to secure [Gill's] testimony as a witness in a criminal prosecution, a province of the prosecutor."  Adams v. Hanson, 656 F.3d 397, 404 (6th Cir. 2011). Put differently, their conduct constituted an "effort to control the presentation of [a] witness's testimony," which is "fairly within [their] function as an advocate."  Imbler, 424 U.S. at 430. Although this Circuit has not passed on the applicability of absolute immunity to prosecutorial conduct *vis-à-vis* third-party witnesses, a bevy of other Circuits has done so, and the Court finds these decisions persuasive.  See Adams, 656 F.3d at 404 (holding that prosecutor's alleged false, out-of-court statement to judge regarding availability of witness, which led to witness's nearly two-week detention, was protected by absolute immunity); Garmon v. Cty. of Los Angeles, 828 F.3d 837, 845 (9th Cir. 2016) (prosecutor's issuance of subpoena (but not false statement in supporting affidavit) entitled to absolute immunity); Betts v. Richard, 726 F.2d 79, 81 (2d Cir. 1984) (prosecutor's request for arrest warrant from judge, which resulted in witness's arrest and overnight incarceration to ensure attendance at criminal trial, covered by absolute immunity); Daniels v. Kieser, 586 F.2d 64 (7th Cir. 1978) (persuading court to issue material-witness warrant by making false statements protected by absolute immunity).  The Government has therefore carried its burden of establishing that Martins and Miller are entitled to prosecutorial immunity.

## 2. *Qualified Immunity*

Even if absolute immunity did not apply, all of the Individual Defendants are protected by qualified immunity.  That doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (emphasis added) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  It

serves the dual purpose of maintaining accountability when public officials "exercise power irresponsibly" while "shield[ing] officials from harassment, distraction, and liability when they perform their duties reasonably." Id. Qualified immunity "applies in Bivens actions as it does elsewhere." Lash v. Lemke, 786 F.3d 1, 5 (D.C. Cir. 2015).

The manner in which courts are permitted to resolve qualified-immunity defenses protects from unnecessary constitutional conjecture: "[C]ourts may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all." Daugherty v. Sheer, 891 F.3d 386, 390 (D.C. Cir. 2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). For a right to be clearly established, its "contours [must be] sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Lash, 786 F.3d at 5 (quoting Plumhoff v. Richard, 572 U.S. 765, 779 (2014)). Indeed, "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. Al-Kidd, 563 U.S. 731, 741 (2011).

To begin, the named Marshals are clearly entitled to qualified immunity because the constitutional questions in this case fall well short of being "clearly established." It would not have been clear to a reasonable officer that Gill's seizure and detention violated his Fourth Amendment rights. See Pearson, 555 U.S. at 243–44. The Marshal Defendants received a warrant issued by Spath, a military judge, "command[ing] and empower[ing]" them to "apprehend" Gill and "forthwith bring him" to Alexandria. See First Am. Compl., ¶ 39. The Marshals thus acted on what appeared to be a facially valid warrant for a non-appearing witness. See R.M.C. 703(e)(2)(G)(ii) (dictating that no warrant of attachment may issue unless there is "probable cause to believe that the witness was duly served with a subpoena . . . [and] that the

witness refused or willfully neglected to appear").  This alone is sufficient "to cloak them with qualified immunity and require dismissal of these suits."  Bailey v. U.S. Marshal Serv., 584 F. Supp. 2d 128, 133 (D.D.C. 2008).  Contrary to Gill's assertions, it was not unreasonable for them to assume the warrant's lawfulness, particularly given the fact that it complied with the relevant regulations.  See Elkins v. Dist. of Columbia, 690 F.3d 554, 569 (D.C. Cir. 2012) (police officers "may accept the word of their superiors that they have a warrant and that it is valid").

Additionally, the manner in which the Marshals carried out the warrant and procured Gill's testimony did not violate his clearly established Fourth Amendment rights.  Gill claims that the Marshals acted unlawfully in arresting him with guns drawn, searching his home, and transporting him in handcuffs to Virginia.  Claims of excessive force in the context of arrests are analyzed under the Fourth Amendment's "objective reasonableness standard."  Saucier v. Katz, 533 U.S. 194, 204 (2001).  Because arresting officers are often forced to make "split-second judgments," the Supreme Court has "cautioned against the '20/20 vision of hindsight' in favor of deference to the judgment of reasonable officers on the scene."  Id. at 205 (internal quotation marks omitted).  With the benefit of hindsight, the Marshals' conduct may have been overly dramatic, but their brief display of force and Defendant Wilson's conducting of a protective sweep of Gill's home fall within what the Supreme Court has found to be constitutionally permissible.  See, e.g., Los Angeles Cty. v. Rettele, 550 U.S. 609, 615 (2007); United States v. Thomas, 429 F.3d 282, 286–90 (D.C. Cir. 2005) (holding that protective sweep of entire apartment during search incident to arrest was lawful).  This conclusion holds, moreover, even if, as Gill claims, the Marshals violated R.M.C. 703(g) in exhibiting unnecessary deadly force when enforcing a warrant.  Cf. Davis v. Scherer, 468 U.S. 183, 194–96 (1984) (violation of state regulation does not vitiate qualified immunity).

Moving beyond the seizure, the remaining conduct alleged by Gill represents a far cry from the violation of a "clearly established" constitutional right.  Indeed, Plaintiff barely musters any argument as to how the actions listed in his Complaint, such as his transportation in handcuffs to Virginia and detention in order to procure his testimony, plead a clearly established Fourth Amendment violation or identify the personal participation of any Marshal.  See al-Kidd, 563 U.S. at 735, 743; see also Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

Finally, even if they were not entitled to absolute immunity, Spath, Miller, and Martins would be entitled to qualified immunity.  Gill disputes this, contesting the legality of certain Rules for Military Commissions (promulgated by DOD) authorizing military prosecutors to issue subpoenas and military judges to issue warrants of attachment for third-party witnesses.  Even if he is right, no court has embraced those arguments, and, in fact, a court in the Southern District of New York recently rejected them in part.  See Yaroshefsky v. Mattis, No. 17-8718, ECF No. 22 (S.D.N.Y. Nov. 15, 2017) (petitioner unlikely to succeed on merits of claim that military judge lacks authority to issue subpoena compelling testimony of third-party witness).  As a result, these Defendants' actions did not violate a clearly established right.

Qualified immunity "would be utterly defeated if officials were unable to determine whether they were protected by the rule without entangling themselves in the vagaries" of military-commission law.  See Anderson v. Creighton, 483 U.S. 635, 646 (1987).  Where Miller, Martins, and Spath merely followed the applicable regulations — which empower both a military prosecutor to issue a subpoena compelling the presence of a citizen witness and a military judge to issue a warrant of attachment should that person refuse to appear — it cannot be said that they

participated in the violation of a clearly established federal right.  See Yowell v. Abbey, 532 F.

App'x 708, 711 (9th Cir. 2013) ("Appellants were following BLM regulations . . . . No court has

held that those regulations violate due process. Thus, it cannot be said that every reasonable

official would have understood that what he is doing violates any clearly established federal

right.") (quoting Reichle, 566 U.S. at 664).

3. *Declaratory Judgment Act Claim*

Next, the Court dismisses the remaining claim against the Individual Defendants brought

under the Declaratory Judgment Act.  It is well established that the DJA is not an independent

source of federal jurisdiction.  See Ali v. Rumsfeld, 649 F.3d 762, 778 (D.C. Cir. 2011).  Instead,

"the availability of declaratory relief presupposes the existence of a judicially remedial right."

Id. (quoting C & E Servs., Inc. of Washington v. D.C. Water & Sewer Auth., 310 F.3d 197, 201

(D.C. Cir. 2002)).  Because the Individual Defendants are entitled to immunity from suit, Gill

has not identified a judicially remediable claim over which this Court has jurisdiction.  He

cannot, accordingly, pursue a DJA claim against them here.

C.  FTCA Claims

With respect to Plaintiff's FTCA claims against the Government, the Court holds that

proper venue lies in Massachusetts.  The FTCA has a unique venue provision, which provides:

> Any civil action on a tort claim against the United States under
> subsection (b) of section 1346 of [Title 28] may be prosecuted only
> in the judicial district where the plaintiff resides or wherein the act
> or omission complained of occurred.

28 U.S.C. § 1402(b).  "Under the prevailing interpretation of section 1402(b), venue is proper in

the District of Columbia if sufficient activities giving rise to plaintiff's cause of action took place

here."  Patel v. Phillips, 933 F. Supp. 2d 153, 165 (D.D.C. 2013) (quotation omitted).

As the Government highlights, almost <u>none</u> of the conduct alleged occurred here in Washington.  Gill claims that the Government acted unlawfully in seizing him and searching his home in Massachusetts, transporting him from Massachusetts to Virginia, and detaining him in Virginia.  With regard to the District, he offers only the vague allegation that the acts at issue were "approved by DOJ, USMS, and/or DOD officials within Washington, D.C."  First Am. Compl., ¶ 40.  But if such an allegation were sufficient to establish venue under the FTCA, almost <u>every</u> FTCA claim could be pursued here.  The Court is hard pressed to imagine a case lodged against the federal government that could not allege the participation of an unspecified official in Washington.  For this reason, "[i]t is well established that 'mere involvement on the part of federal agencies, or some federal officials who are located in Washington D.C., is not determinative of venue.'"  <u>Chauhan v. Napolitano</u>, 746 F. Supp. 2d 99, 103 (D.D.C. 2010) (quoting <u>Aftab v. Gonzalez</u>, 597 F. Supp. 2d 76, 82 (D.D.C. 2009)).

If a court finds that venue is improper in its own jurisdiction, it may dismiss the case "or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."  28 U.S.C. § 1406(a).  The District of Massachusetts, where much of the alleged conduct supporting Gill's FTCA claims occurred, seems to be the most proper venue for those claims.  "Generally, the interest of justice requires transferring such cases to the appropriate judicial district rather than dismissing them."  <u>Sanchez <i>ex rel.</i> Rivera-Sanchez v. United States</u>, 600 F. Supp. 2d 19, 22 (D.D.C. 2009).  The Court therefore declines to rule on the merits of Gill's FTCA claims (along with his sole DJA claim against the Government), but it does find that it is in the interest of justice to transfer the matter.  <u>See Hoffman v. Fairfax Cty. Redev. & Hous. Auth.</u>, 276 F. Supp. 2d 14, 17 (D.D.C. 2003) (declining to rule on substantive

merits of defendant's motion to dismiss because transferee court would be better suited to address matter).

## IV.    Conclusion

For these reasons, the Court will grant the Individual Defendants' Motion to Dismiss, and it will transfer what is left of the case to the District of Massachusetts.  A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  November 21, 2019